UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

ERNESTO V. GRIMALDO,           )
          )
        Plaintiff,      )
          )
v.                )     CIVIL ACTION NO.
          )     5:13-CV-098-BG
          )     ECF
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,   )
          )
          )
       Defendant.    )

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Ernesto V. Grimaldo seeks judicial review of a decision of the Commissioner of Social Security denying his application for supplemental security income (SSI) benefits. The United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. In accordance with the order of transfer, the undersigned now files this Report and Recommendation.

## I.    Statement of the Case

Grimaldo protectively filed his current SSI application on September 22, 2010. His claim was denied initially and on reconsideration, and he thereafter requested a hearing before an administrative law judge (ALJ). On February 21, 2012, Grimaldo and a vocational expert testified at a hearing before an ALJ. Grimaldo was represented by an attorney at the hearing. The ALJ determined on March 7, 2012, that Grimaldo was not disabled because he could perform jobs that exist in significant numbers in the national economy. The Appeals Council denied review on February 12, 2013. Following denial of a request for review, the ALJ's decision becomes the

Commissioner's final decision and is properly before the court for review. *Sims v. Apfel*, 530 U.S. 103, 107, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000); *see also Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) (holding the Commissioner's final decision incorporates the Appeals Council's denial of a claimant's request for review).

## II.    Factual Background

Grimaldo claims that he became disabled due to diabetes mellitus and schizophrenic, paranoid, and other functional psychotic disorders. (Tr. 57–58.) Grimaldo completed school through the ninth grade and later received a GED. (Tr. 38, 129.) He last worked in 2007 at the age of 39 as an electrician, and he previously worked in various construction jobs, including as a laborer, roofer, and steel worker. (Tr. 125, 142.) He claims that he is unable to work because of pain in his knees and also because the voices in his head affect his ability to interact appropriately with coworkers. (Tr. 41.)

## III.   Standard of Review

A court reviewing the Commissioner's denial of disability insurance benefits is limited to determining (1) whether the decision is supported by substantial evidence in the record and (2) whether the Commissioner applied the proper legal standards. *See* 42 U.S.C. § 405(g) (2014); *see e.g.*, *Higginbotham*, 405 F.3d at 335. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Without reweighing the evidence or substituting its own judgment, a reviewing court must examine the entire record, including evidence favorable to the Commissioner as well as contrary evidence. *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If the Commissioner's findings are supported by

substantial evidence, they are treated as conclusive and will be affirmed. *See Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).

## IV.   <u>Discussion</u>

Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). In making a disability determination, the Commissioner conducts a five-step sequential evaluation process to determine whether: (1) the claimant is currently working; (2) the claimant has a "severe impairment"; (3) the impairment meets or equals an impairment listed in Appendix 1 of the regulations; (4) the claimant is capable of performing past relevant work; and (5) whether the claimant, after taking into account age, education, previous work experience, and residual functional capacity, is capable of performing any other work. *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); 20 C.F.R. § 416.920(a)(4) (2013). If a disability determination is made at any step in the process, the finding is conclusive and the analysis terminates. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

At the first four steps in the analysis, the claimant bears the burden of proof. *Id.* Once this burden is satisfied, the Commissioner bears the burden of showing the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* After making such a showing, the burden shifts back to the claimant to rebut the Commissioner's finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In this case, the ALJ determined: (1) Grimaldo was not currently engaged in substantial gainful activity; (2) Grimaldo's impairments—osteoarthritis, obesity, diabetes mellitus, diagnosed

3

paranoid schizophrenia versus bipolar disorder, and a history of polysubstance abuse—were severe in nature; and (3) Grimaldo did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1.  (Tr. 20.)  Following step three, the ALJ assessed Grimaldo's residual functional capacity (RFC) and found that he had the RFC to perform light work with the following limitations: the opportunity to alternate between sitting and standing at the worker's option; no climbing, crawling, kneeling, or squatting; only occasional stooping and crouching; not working with the general public; only superficial contact with coworkers and supervisors; and limited to simple work.  (Tr. 27.)

At step four, the ALJ found that Grimaldo could not return to his past relevant work, which is classified under the regulations as medium to very heavy depending on the position.  (Tr. 28.)  After considering testimony from a vocational expert and Grimaldo's RFC, age, education, and work experience, the ALJ concluded at step five—using the Medical-Vocational Guidelines as a framework—that Grimaldo was capable of performing other jobs that exist in significant numbers in the national economy.  (Tr. 28–29.)

Grimaldo argues on appeal, however, that his diagnosis of schizophrenia met or medically equaled the definition of disabled under 20 C.F.R., pt. 404, subpt. P, app. 1 § 12.03 of the Listings of Impairments at the time that he protectively filed for SSI benefits on September 22, 2010.  Pl.'s Br. 29–30.  If an adult claimant is not working and his impairment equals or is equivalent to one of the listed impairments, a presumption of disability applies and the claimant qualifies for benefits without further inquiry into the claimant's age, education, and work experience.  *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990); 20 C.F.R. § 416.920(d).

Under Listing § 12.03 "Schizophrenia, Paranoid, and Other Psychotic Disorders," a claimant

satisfies the required level of severity either (1) when he meets the requirements of both paragraphs A and B, or (2) when he meets the requirement of paragraph C. *See Pagan v. Bowen*, 862 F.2d 340, 343 (D.C. Cir. 1988). The claimant must first show the existence of certain medical symptoms associated with schizophrenia under Paragraph A. *Id.* Next, the claimant must show the existence of two or more functional limitations at the stated level of severity as detailed in Paragraph B. *Id.* Grimaldo argues that he meets the requirements of both paragraph A and paragraph B criteria:

> A.    Medically documented persistence, either continuous or intermittent, of one or more of the following:
> 1.    Delusions or hallucinations; or
> 2.    Catatonic or other grossly disorganized behavior; or
> 3.    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
>     a.    Blunt affect; or
>     b.    Flat affect; or
>     c.    Inappropriate affect; or
> 4.    Emotional withdrawal and/or isolation; AND
> B.    Resulting in at least two of the following:
> 1.    Marked restriction of activities of daily living; or
> 2.    Marked difficulties in maintaining social functioning; or
> 3.    Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R., pt. 404, subpt. P, app. 1 § 12.03(A), (B).

In regard to the Listings, the ALJ stated in his opinion: "the evidence shows that the claimant's diagnosed paranoid schizophrenia versus bipolar disorder and history of polysubstance abuse have caused no more than mild sustained limitations in his daily activities, no more than moderate sustained limitations in his social functioning, concentration, persistence and pace, no prolonged episodes of decompensation, no 'marginal adjustment,' and no need for a highly supportive living arrangement under the provisions of §§ 12.03, 12.04, and 12.09, respectively, of the Listing." (Tr. 24.) But substantial evidence does not support the ALJ's conclusion that

Grimaldo's mental illness does not meet the requirements of a listed impairment. Had the ALJ considered Grimaldo's documented history of hallucinations, together with all of the other relevant evidence, he might have determined that Grimaldo's schizophrenia met or equals a listed impairment under § 12.03; therefore, remand is appropriate. *See McQuin v. Comm'r*, No. 3:12-CV-1704, 2014 WL 1369674, at *5 (N.D. Ohio 2014) (reversing the ALJ's decision when consideration of certain relevant evidence of record may have led to a conclusion that the claimant met or medically equaled a Listing § 12.03 impairment).

### A.   Paragraph A criteria

Grimaldo argues that he meets the paragraph A criteria because he has a medically-documented persistent history of auditory and visual hallucinations.[1] Pl.'s Br. 30. He claims that although these hallucinations were exacerbated when he abused drugs, the hallucinations persisted despite his abstinence from illicit drug use, as documented in his medical records. *Id.*

Documentation in the record of Grimaldo's complaints of auditory hallucinations dates back to 2006. During an initial mental health eligibility determination at Lubbock Regional MHMR Center (MHMR) on February 27, 2006, a licensed clinical social worker listed Grimaldo's chief complaint as hearing voices inside and outside of his head, ongoing for the past four years. (Tr. 283.) Grimaldo reported that the voices tell him both good and bad things; for example, the voices sometimes tell him to kill people. *Id.* He reported great distress with all of his personal relationships and being fired from his job. *Id.* The clinician noted that Grimaldo responded to external stimuli not present during the interview. *Id.* He documented Grimaldo's emotional functioning as cooperative, but anxious and preoccupied. (Tr. 284.) Grimaldo was diagnosed as

---

[1] Under § 12.03(A), a claimant must have a medically documented persistence, either intermittent or continuous, of one or more of four criteria, one of which is delusions or hallucinations. § 12.03(A)(1).

having schizophrenia, paranoid type.  (Tr. 287.)

On March 2, 2006, Grimaldo again visited MHMR and Alice Park, M.D., performed a psychiatric evaluation.  (Tr. 296–98.)  Dr. Park noted Grimaldo reported that the voices started four years prior when he was using cocaine and methamphetamines heavily, but the voices continued after he stopped using drugs.  (Tr. 296.)  Dr. Park found that Grimaldo had no negative symptoms of social withdrawal, decreased hygiene, or isolation, and he denied visual hallucinations or delusions.  *Id.*  She diagnosed him with psychotic disorder, NOS, and noted that his auditory hallucinations had malingering features.  (Tr. 297–98.)  She gave him a GAF score of 60 and prescribed Haldol, which treats mental illnesses such as schizophrenia.[2]  (Tr. 298.)

Grimaldo was not evaluated at MHMR again until almost two years later on January 9, 2008, when he underwent a psychiatric evaluation by Shiraj Vahora, M.D. (Tr. 222–25.)  In addition to hearing voices, Grimaldo reported that he saw visions including "black shadows." (Tr. 222–23.) Dr. Vahora noted that Grimaldo did not follow through with further psychological testing after his evaluation with Dr. Parks in March 2006. (Tr. 222.) Dr. Vahora wrote that Grimaldo's descriptions suggested a high probability for malingering and that he might be minimizing his polysubstance use. (Tr. 224.)  Dr. Vahora also noted that Grimaldo's longitudinal functioning identified possible antisocial features and psychological testing was needed to rule out malingering and anti-social personality disorder.  *Id.*

Grimaldo did not undergo testing; however, the record includes a court commitment application completed by an MHMR staff member approximately three months later on March 21,

---

[2] A Global Assessment of Functioning (GAF) score assigned by a clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness. American Psychiatric Ass'n, <u>DSM- IV-TR</u> 34 (4th ed. 2000).  A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

2008.  (Tr. 215–16.)  The application lists Grimaldo's mother as the petitioner and his sister as an additional contact person.  (Tr. 215.)  On the application, Grimaldo is reported as: constantly talking to unseen people; becoming angry when others inquire about his behavior; believing people are in the vents and attic of his mother's home; being paranoid and afraid of contaminates in his food; and exhibiting sudden shifts in mood, including threats to kill his family.  (Tr. 215.)  The records do not indicate that Grimaldo was hospitalized.

Grimaldo returned to MHMR on May 20, 2009, and he was assessed by Dana Butler, M.D. (Tr. 192–93.)  Grimaldo continued to report hearing voices telling him that people were after him; he reported keeping his bedroom door locked.  (Tr. 193.)  Dr. Butler diagnosed Grimaldo with paranoid schizophrenia and assigned him a GAF score of 45.[3]  (Tr. 192.)  She prescribed Invega, which treats schizophrenia.  (Tr. 193.)  On July 13, 2009, Dr. Vahora maintained Grimaldo's diagnosis of paranoid schizophrenia, assigned him a GAF score of 50, and renewed his Invega prescription.  (Tr. 190–91.)

Grimaldo was not consistently evaluated again until two years later in the fall of 2011—after he protectively filed his application for SSI benefits—when he saw Nurse Practitioner (N.P.) Kimberlee Gutierrez at the Larry Combest Health & Wellness Center.  During that time, Grimaldo visited N.P. Gutierrez once a month between August and December 2011, with the exception of November.  (Tr. 520, 523, 527, 531.)  In her August treatment notes, N.P. Gutierrez documented hallucinations under Grimaldo's subjective complaints.  (Tr. 531.)  Under objective examination, Grimaldo was documented as anxious and manic, with pressured speech and a flight of ideas.  (Tr.

---

[3] A GAF score between 41 and 50 indicates serious symptoms or serious impairments in social or occupational functioning, such as having no friends or being unable to keep a job.  DSM- IV-TR, at 34.

8

533.)  He was prescribed Haldol, among others medications.  *Id.*

In September, Grimaldo reported a decrease in hearing voices. (Tr. 527.) Despite an anxious affect and pressured speech, he was documented as having normal thought and perception in September and October. (Tr. 525, 529.) In October, N.P. Gutierrez omitted paranoid schizophrenia from her notes, inserting instead a diagnosis of bipolar disorder.  (Tr. 525.)  She  noted that Grimaldo had not started taking Haldol due to a lack of funds.  *Id.*  In December, N.P. Gutierrez diagnosed paranoid schizophrenia in her assessment; however, she again noted that Grimaldo had not started Haldol due to lack of funds.  (Tr. 522.)  She also documented that he continued to request hydrocodone despite her denials.  *Id.*

In his opinion, the ALJ discounted N.P. Gutierrez's mental health treatment record, finding "no evidence that this nurse practitioner has any training or expertise in psychiatry" and that "her report of [Grimaldo's] psychiatric state reflected no abnormalities other than an anxious appearance." (Tr. 23.)  N.P. Gutierrez's notes regarding Grimaldo's mental health complaints are, however, consistent with Grimaldo's previous clinical record.  Despite large breaks in care, he repeatedly self-reported auditory hallucinations over the entire course of his treatment record.  (Tr. 193, 196, 211, 222, 296, 520, 523, 527, 531.)  He was diagnosed with paranoid schizophrenia or assigned a GAF score of 50 or less by clinicians multiple times between 2006 and 2009.  (Tr. 190, 192, 213, 224.)   In his opinion, the ALJ found Grimaldo lacked credibility, pointing out that Grimaldo failed to comply with requests to undergo further psychological testing and that Grimaldo was not often taking medications for his mental health complaints. (Tr. 20–23, 27.)  Courts have recognized, however, that an individual's noncompliance with medication regimes may be attributable to the mental illness itself, rather than willful conduct.  *See*, *e.g.*, *Pitkin v. Astrue*, No.

C08-4049-PAZ, 2009 WL 1259270, at *5–6 (N.D. Iowa May 6, 2009) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)).  *See also Johnson v. Astrue*, 493 F. Supp. 2d 652, 661 (W.D.N.Y. 2007) (noting the absence of antipsychotic treatment was due to claimant's belligerence rather than any lack of diagnostic certainty on the part of the doctors). Further, Grimaldo testified to financial problems and lack of medical insurance as additional reasons for his sporadic treatment. (Tr. 43–44.)

Grimaldo also objects to the "little weight" afforded by the ALJ to the intake report performed by a licensed professional counselor at MHMR on August 1, 2011.  Pl.'s Br. 30.  On that date, Grimaldo was assigned a GAF score of 40.  (Tr. 536–47.)  In his decision, the ALJ noted, among others reasons, the lack of clinical evidence supporting the clinician's assessment and the lack of indication that Grimaldo was referred for treatment.  (Tr. 22.)  But similar to N.P. Gutierrez's treatment record, the clinician's evaluation comports with Grimaldo's history of mental illness. Psychiatric impairments are not readily amendable to objective laboratory testing; mental health diagnostic techniques rely instead upon monitoring, interviews, and observed symptomolgy.  *See Poulin v. Bowen*, 817 F.2d 865, 874 (D.C. Cir. 1987).

During the hearing before the ALJ, Grimaldo testified that the voices he hears threaten to kill him and his family and cause conflicts for him in his home and work life.  (Tr. 47–50.)  When asked what causes the conflict between himself and his family, he answered, "that people, or the TV or something, somebody's telling them lies about me just to make my life harder."[4]  (Tr. 49)  *See also*

---

[4]An individual's beliefs that the television or radio is speaking to him are termed "ideas of reference."  *See Willims v. Apfel*, 73 F. Supp. 2d 1325, 1332 n.7 (M.D. Fla. 1999).  Grimaldo exhibits such ideas of reference; for example, during one assessment he reported hearing voices coming out of engines, the refrigerator, and the lawn mower, and in another assessment, the television, radio, computer, and air conditioner.  (Tr. 246, 283.)

*Williams v. Apfel*, 73 F. Supp. 2d 1325, 1332 (M.D. Fla. 1999) (noting claimant testified that "she continued to have hallucinations, and she believed people were trying to harm her, follow her, or contact her through the television").  As detailed above, Grimaldo's testimony comports with a medically-documented persistence of auditory hallucinations.  In this regard, Grimaldo would appear to satisfy the paragraph A criteria under Listing § 12.03.

> **B.      Paragraph B criteria**

Grimaldo contends that he meets two of the four additional criteria as required by paragraph B of Listing § 12.03, including: (1) marked difficulties in maintaining social function; and (2) marked difficulty in maintaining concentration, persistence, or pace.  Pl.'s Br. 31.  The listings define "marked" as a degree of limitation that is more than moderate, but less than extreme. 20 C.F.R., pt. 404, subpt. P, app. 1 §12.00(C); 20 C.F.R. § 416.920a(c)(4).

In arguing that he meets the requirement of "marked difficulties in social functioning," Grimaldo points to the fact that he was fired from all of his jobs between 1997 and 2007.  Pl.'s Br. 31.  At the hearing, Grimaldo testified that he was only able to work for a few months before being terminated due to conflicts with co-workers, with the exception of a job that he held for seven months apparently because he explained his illness to the other four employees. (Tr. 40–41.)  He testified that he would hear voices, start cursing, and other employees would think that he was cursing at them.  (Tr. 41.)  In addition, Grimaldo points to his inconsistent living arrangements and inability to maintain a stable home life.  Pl.'s Br. 31–32.  He testified that he alternately stays with his mother, brother, sister, or girlfriends.  (Tr. 48, 310, 411.)  Although he reports staying with family, he stated during one mental assessment that he considers himself homeless.  (Tr. 224.)  In an evaluation requested by disability determination services on August 24, 2009, Arun Patel, M.D.,

documented that Grimaldo had good interaction with his family, but he had limited friends and very rarely left the house. (Tr. 325.) Further, Dr. Patel assigned Grimaldo a GAF score of 50 and listed Grimaldo's prognosis as poor. (Tr. 326.)

Next, Grimaldo argues that he meets the criteria of "marked difficulty in maintaining concentration, persistence or pace," as evidenced by his difficulty focusing during the hearing and documentation of his rambling and pressured speech in the medical record. (Pl.'s Br. 32.) The transcript shows that Grimaldo had trouble staying on task when answering the ALJ's questions, and he testified that he has difficulty focusing. (Tr. 53.) On a field office disability report dated October 29, 2010, the interviewer noted that Grimaldo "would not keep quiet and talked 100mph the entire interview." (Tr. 163.) During an assessment in August 2011, Grimaldo's speech was described as rambling and pressured/rapid. (Tr. 537.)

The ALJ and the Commissioner, on the other hand, lend significant weight to an assessment performed on May 11, 2011, by consultative examiner Margaret Meyer, M.D., in which she found that Grimaldo demonstrated only moderate limitations in social functioning and concentration, persistence, and pace. (Tr. 434.) Grimaldo's inability to respond appropriately in work situations, his strained relationship with his family, the records of his treating clinicians, and his behavior at the hearing, however, all suggest a stronger degree of impairment than that found by the consultative examiner. *See Johnson*, 493 F. Supp. 2d at 658–59 (finding claimant's work history and strained relationship with his mother were inconsistent with a finding of "mild" social impairment). Because strong evidence suggests that Grimaldo meets both the paragraph A and paragraph B criteria of Listing § 12.03, this case should be remanded for a determination of whether Grimaldo's impairments are equal or medically equivalent to those detailed in Listing § 12.03. In such a

situation, a medical expert may be needed to determine the onset and nature of limitations imposed by Grimaldo's schizophrenia. *See Williams v. Astrue*, No. CV-11-2634-CW, 2012 WL 1570576, at *5 (C.D. Cal. 2012); *McQuin*, 2014 WL 1369674, at *14.

Because a determination at step three would render Grimaldo's second issue moot, the undersigned declines to reach the issue of whether the ALJ improperly failed to consider the impact that Grimaldo's mental impairments had on his functional ability; however, if appropriate this issue should also be addressed on remand. *See McQuin*, 2014 WL 1369674, at *16 (declining to address claimant's remaining arguments because remand was appropriate).

## V.    **Recommendation**

For the foregoing reasons, the undersigned recommends that the United States District Court reverse the Commissioner's decision and remand for further administrative proceedings.

## VI.    **Right to Object**

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy.  28 U.S.C. § 636(b)(1) (2014); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to timely file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass*

*v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:        May 14, 2014.

NANCY M. KOENIG
United States Magistrate Judge

14